**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BRYAN HARRIS,                                                    Case No. 1:20-cv-844

        Plaintiff,                                          Dlott, J.
                                                                Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


**REPORT AND RECOMMENDATION**

Plaintiff Bryan Harris filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

    **I. Summary of Administrative Record**

In October 2017, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning two months prior, on August 16, 2017, when he was struck in the face by a piece of wood while working at a sawmill and suffered skull and facial fractures and a traumatic brain injury ("TBI"). After Plaintiff's application was denied initially and upon reconsideration, he requested an evidentiary hearing. On October 2, 2019, Plaintiff appeared with counsel and gave testimony before Administrative Law Judge ("ALJ") David W. Thompson. A vocational expert and Plaintiff's girlfriend also testified. (Tr. 34-61).

1

Plaintiff was 27 years old at the time of his accident and remained in the "younger individual" age category at the time of the ALJ's December 26, 2019 decision. (*See generally,* Tr. 15-27). In that decision, the ALJ determined that Plaintiff has the following severe impairments: status-post fractures of the skull without intracranial injury, neurocognitive disorders and depressive/bipolar disorders. (Tr. 17). The ALJ determined that other issues, including diminished visual acuity, glaucoma, and other medical issues that occurred at the time of his accident were "non-severe." (Tr. 18). Plaintiff does not dispute the ALJ's findings concerning which of his impairments were severe. However, Plaintiff does dispute the ALJ's further determination that his cognitive impairment does not meet or medically equal Listing 12.02 in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 18).

After determining that Plaintiff can no longer perform his past work, the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform sedentary work, subject to the following non-exertional limitations:

> [H]e can never climb ropes or scaffolds, but can occasionally climb ramps, stairs and ladders and can occasionally stoop, kneel, crouch and crawl. He must avoid even moderate exposure to unprotected heights and unprotected moving machinery. He is limited to jobs that can be learned in 30 days or fewer. Such jobs must only require up to detailed but uninvolved tasks, with few concrete variables, and with little in the way of change in job process from day to day. Where such jobs include multi-step tasks, such steps must be self-evident so as to be easily resumed after momentary distraction. He is limited to occasional work-related contact with the public, co-workers and supervisors.

(Tr. 19). Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a "significant number" of jobs in the national economy, including the representative jobs of assembler, inspection work, and hand trimmer. (Tr. 26). Therefore, the ALJ determined that Plaintiff

2

was not under a disability. The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In his appeal to this Court, Plaintiff argues that the ALJ erred by failing to find his neurocognitive impairment met or medically equaled Listing 12.02, and by improperly evaluating the medical opinion evidence. I find no reversible error.

**II. Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion....

> The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

### III. Analysis

Plaintiff first argues that the ALJ committed reversible error at Step 3 by failing to find that he met Listing 12.02. Second, Plaintiff argues that the ALJ erred in his evaluation

of the medical opinion evidence. Prior to addressing these two claims, the undersigned briefly reviews the relevant medical evidence.

### A. Relevant Medical Evidence

As noted by the ALJ, Plaintiff has undergone multiple psychological and physical examinations since his traumatic injury on August 16, 2017. (*See* Tr. 24, citing an "almost endless series of opinions."). Because Plaintiff's claims focus on his psychological and/or neurological impairments, the undersigned begins with the records that most closely relate to those claims.

On December 14, 2017, Dr. Froilan, PhD, first noted signs of cognitive dysfunction with some concentration and abstract reasoning difficulties. (Tr. 21-22, citing Tr. 1346-47). Based on his evaluation, Dr. Froilan diagnosed an adjustment disorder with depressed mood and a major neurocognitive disorder due to TBI and a neurological sign relating to his vision. (Tr. 1347-1348). Still, Dr. Froilan found immediate and short-term memory functions to be intact and overall Plaintiff's performance on general cognitive tasks, including reading, following written instructions, and a simple verbal command, to be "within normal limits." (Tr. 1346). Dr. Froilan opined that Plaintiff was not capable to returning to his former job and was not a candidate for vocational rehabilitation because his "alleged conditions likely would preclude the effectiveness of such a program *currently*." (Tr. 1350, emphasis added).

Nine days later on December 23, 2017, Plaintiff was examined by Dr. Sed, PhD. Dr. Sed found deficits in both immediate and delayed memory, in which Plaintiff scored "in the extremely low classification." (Tr. 22 citing Tr. 1327). In attention and concentration, Dr. Sed assessed Plaintiff's abilities as "adequate" on simple tasks but as

"not adequate" on multi-step tasks.  (*Id*.)  Dr. Sed diagnosed Plaintiff with a neurocognitive disorder in the "mild" category due to traumatic brain injury and depression.  (Tr. 1328).

Dr. Roberto Madigral, PhD, next evaluated Plaintiff on February 13, 2018.  Dr. Madrigal found results consistent with "mild depression," but detected "no significant neurocognitive problems" on the date of his examination.  (Tr. 1339; *see also* Tr. 22).  Dr. Madrigal therefore did not diagnose a neurocognitive disorder, despite acknowledging earlier examination reports that suggested that he "may have experienced them [signs of a neurocognitive disorder] briefly" after his accident.  (*Id*.)

On January 8, 2018 and again on April 19, 2018, two state agency DDS psychologists (Dr. Malloy, PhD and Dr. Goldsmith, PhD), evaluated the record and assessed Plaintiff with "moderate" limitations in the four paragraph B domains.  (Tr. 25, citing Tr. 67, 71-72 and Tr. 86, 88-89, 92-93).

On May 25, 2018, a supervising neuropsychologist noted that Plaintiff and his family were satisfied with his current condition, that he did not want to take any medication and had no interest in further psychiatric care.  (Tr. 22, citing Tr. 2218).

Dr. Elizabeth Cook, PhD, ABPP, next administered a series of neuropsychological tests in August 2018.  Dr. Cook diagnosed "low average" general intellectual ability, academic skills at the 5th percentile or lower, and compromised executive functioning, with difficulty organizing information, drawing conclusions, dealing with multiple pieces of information and with processing speed.  (Tr. 22 citing 38F at 2-5; *see also* Tr. 2299-2301, Tr. 2539).

The record also contains relevant evidence from Plaintiff's psychotherapy treatment with Dr. Stephen Ford, PhD, LPCC, between January 2018 and February 2019.

(Tr. 22). Dr. Ford completed multiple Bureau of Workers' Compensation ("BWC") checkbox forms after each appointment. On those forms, Dr. Ford often rated Plaintiff's mental restrictions as "marked" in four BWC categories: social functioning; concentration, persistence and pace; activities of daily living; and the ability to adapt appropriately in stressful situations including the workplace.[1] (Tr. 24, citing 21F, 26F and 37F). Although Dr. Ford's records contain a summary of Plaintiff's subjective complaints and brief estimation of his progress, the forms lack any substantive clinical examination evidence such as mental status exams. (Tr. 22; *see also* Tr. 2337, 2409).

On September 11, 2019, Dr. Shuman, PsyD, rated Plaintiff as only "moderately" limited in all functional categories on a similar BWC form, after another individual therapy session. (Tr. 2500).

In addition to all of the above psychological and neurological evidence, Plaintiff's second claim touches briefly on evidence supplied by treating Nurse Practitioner ("NP") Adkins, who opined on multiple occasions that Plaintiff was unable to work.

### B. Plaintiff's Claim that the ALJ Erred at Step 3

Plaintiff first argues that the ALJ erred by failing to find at Step 3 of the sequential analysis that he met or equaled Listing 12.02 for Neurocognitive Disorders. To prove that he meets all of the elements of Listing 12.02, Plaintiff must show that he meets or equals either the criteria listed in paragraphs A and B, or alternatively, the criteria listed in paragraphs A and C.

---

[1]As discussed below, the BWC categories on the forms do not perfectly correspond with the paragraph B domains. For example, there is no BWC category that directly corresponds to the paragraph B domain of understanding, remembering, and applying information, and two separate BWC categories correspond to the paragraph B domain of adapting and managing oneself.

7

### 1. Paragraph A Criteria for Listing 12.02

Under paragraph A, Plaintiff was required to show medical documentation of a "significant decline in cognitive functioning" from his prior level of functioning. *Id.* The ALJ's opinion contains no overt discussion of whether Plaintiff's condition satisfies the paragraph A criteria, (*see* Tr. 18), and the Commissioner does not seriously dispute Plaintiff's contention that he meets this criteria. Given the absence of contrary argument and analysis by the ALJ, as well as the undersigned's review of the record, I conclude that Plaintiff has carried his burden to show that he satisfies paragraph A criteria. (*See generally*, Tr. 2299, August 2018 report assessing a "compromise in Executive Functioning" that was "consistent with CT that indicated 'possible atrophy…over the frontal lobes,'" and that was attributable to a combination of Plaintiff's August 2017 TBI, a prior 2010 injury, and "premorbid general intellectual abilities and skills.").

### 2. Paragraph B Criteria for Listing 12.02

Plaintiff faces a much steeper hurdle to satisfy the paragraph B criteria, which requires him to prove either one "extreme" limitation, or "marked" limitations in at least two of four broad areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentration, persistence or maintaining pace; and (4) adapting or managing oneself. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1202(B)(1)-(4). The rating scale uses "moderate" to define functioning that is fair, a "marked" limitation to indicate functioning that is seriously limited, and an "extreme" limitation to indicate a total inability to function in that area independently, appropriately, effectively, and on a sustained basis. *Id.*, § 12.00(F)(2)(c) – (e). On the record presented, the ALJ determined that Plaintiff had only "moderate" limitations in all

8

four paragraph B areas.  The ALJ began by finding that Plaintiff has moderate restrictions in the first, third, and fourth domains.  (Tr. 22).

Plaintiff does not challenge the ALJ's determination that he has only "moderate" limitations in the third domain of concentration, persistence and pace.  However, Plaintiff urges this Court to reverse on grounds that the record supports "at least marked" limitations in each of the other three paragraph B domains.  The undersigned concludes that the ALJ's paragraph B analysis in all four domains is substantially supported.

### a.  Understanding, Remembering and Applying Information

In evaluating the degree of limitation in the first paragraph B domain, the ALJ cited to a total of five different psychological evaluative reports, including: (1) Dr. Froilan's finding that Plaintiff's immediate and short-term memory functions were intact and that his overall performance on general cognitive tasks, including reading, following written instructions, and a simple verbal command, were all "within normal limits." (Tr. 1346); (2) Dr. Madrigal's February 2018 examination report, in which that psychologist found insufficient evidence to support the diagnosis of a persistent neurocognitive disorder; (3) Dr. Cook's objective testing that reflected that Plaintiff's overall intelligence, memory scores for verbal and visual information and memory for other types of input are all within the low average range; and (4) the assessments of two non-examining agency psychologists, Drs. Malloy and Goldsmith, based upon their respective reviews of the record in January and April 2018.

In favor of reversal, Plaintiff first questions the ALJ's partial reliance on Dr. Madrigal's report as one of the five cited records, because the ALJ found a "severe" neurocognitive impairment and Dr. Madrigal did not make that diagnosis.  However, the

ALJ was not required to disregard the entirety of Dr. Madrigal's report merely because Dr. Madrigal did not find the continued presence of diagnostic criteria.[2]  Therefore, the ALJ appropriately cited to Dr. Madrigal's clinical interview and other objective findings in his report that supported no more than "moderate" limitations in understanding, remembering, and applying information.

Plaintiff also complains that the ALJ should have given greater weight to Drs. Cook and Sed, whose reports arguably could have supported a "marked" finding in this domain. For example, Dr. Sed opined that Plaintiff's memory fell within the "extremely low" level of classification on the date of his examination.  (Tr. 1327).  In addition, Dr. Cook noted that Plaintiff's general deficits in executive functioning required that information be presented in an organized manner "without demand for any type of processing" because when Plaintiff has to process incoming disorganized or complex information, his "memory ability substantially declines."  (Tr. 2299).  However, Dr. Cook did not otherwise quantify, in functional terms, the degree to which Plaintiff's ability to understand, remember, or apply information is limited.  And one can reasonably infer from her report that Plaintiff is less limited in his ability to understand, remember, or apply simple information that is presented in an organized manner.

In any event, neither Dr. Cook's nor Dr. Sed's reports mandated a finding of "marked" limitations in this domain.  The presence of some evidence to support a greater limitation does not outweigh the other substantial evidence in the record that supports the ALJ's finding of only "moderate" limitations.

---

[2]Dr. Madrigal's report suggested that Plaintiff may have experienced greater neurocognitive deficits immediately following his TBI.

### b. Interacting with Others

In finding only "moderate" limitations in the second paragraph B domain, the ALJ considered Plaintiff's subjective reports of "irritability and temper-control difficulties in the early aftermath of his injury." (Tr. 23). However, the ALJ noted that the longitudinal record did not support greater than "moderate" limitations, reasoning, by way of example, that "there is no objective evidence of evictions, altercations, or severe social isolation." (*Id.*) The ALJ also cited to multiple clinical examinations, as well as to portions of the psychological examination reports of Dr. Madrigal (Tr. 1343), Dr. Froilan (Tr. 1339) and Dr. Sed (Tr. 1327, 1329) in particular, that supported "moderate" limitations in this domain. Drs. Malloy and Goldsmith, the two agency consulting psychologists, similarly assessed only moderate limitations. Considered in totality, the five psychological opinions and Plaintiff's own reports embody "substantial evidence" to uphold the ALJ's finding of "moderate" limitations in the domain of interacting with others.

In support of his argument that the ALJ should have found at least "marked" limitations, Plaintiff relies on a number of the check-box BWC forms completed by a treating psychologist, Dr. Ford, after each psychotherapy session.[3] On many of those forms, Dr. Ford endorses "marked" or even "extreme" limitations in the comparable workers' compensation category of "Social functioning." In his summary notes at Plaintiff's first visit on 1/31/18, Dr. Ford documents that Plaintiff is "[v]erbally aggressive,

---

[3]The ALJ's opinion includes this erroneous statement: "It is further notable that the claimant has required no mental healthcare treatment for either of his mental impairments." (Tr. 23). However, that misstatement is contradicted elsewhere by the ALJ in the same opinion, wherein he expressly acknowledges that Plaintiff has received psychotherapy treatment from Dr. Ford. Based upon the ALJ's correct statement of the record elsewhere in the same opinion as well as his discussion of Dr. Ford's records, the undersigned finds the single misstatement to be harmless error.

Impulsive verbally with decrease in filtering of language," and that "minor social aggravations cause major verbal outbursts impulsive difficulty interacting without becoming verbally short tempered." (*See* Tr. 1358). Plaintiff cites to other records by Dr. Ford that similarly document his social withdrawal (apart from his girlfriend, children and other family members) and irritability. (*See e.g.*, 1352-1358, 2285-2296, 2336-2349, 2495-2534).

One again, the referenced BWC records are not sufficient, standing alone, to reverse the ALJ's substantially supported finding that Plaintiff has only "moderate" limitations in the domain of interacting with others. While Plaintiff highlights forms that endorse "marked" or "extreme" restrictions, on multiple dates throughout 2018 Dr. Ford checked the "moderate" box in assessing Plaintiff's restriction in the same "Social functioning" category.[4] (*See*, *e.g.* Tr. 2288, 2285, 2290, 2292, 2294, 2296, 2337, 2339, 2349, 2341, 2343, 2345, 2347, 2349, 2534). Dr. Ford also states that Plaintiff is "making progress" and "improving." (*See*, *e.g.*, Tr. 2285). In addition, another clinical psychologist, Dr. Shuman, checked the "moderate" box for all four BWC categories on a virtually identical form on September 11, 2019. (Tr. 24, citing Tr. 2500).

### c. Adapting and Managing Oneself

Plaintiff also challenges the finding that he has only "moderate" limitations in the fourth paragraph B domain of adapting and managing oneself. In light of the foregoing conclusions that the ALJ's "moderate" findings in the first three paragraph B domains are substantially supported, Plaintiff would need to prove at least "extreme" limitations in this

---

[4]Although the ALJ did not discuss the variations among the forms in depth, the ALJ expressly acknowledged that Dr. Ford's ratings include "some variance throughout." (Tr. 24).

final domain in order to prove he meets Listing 12.02 because he satisfies both paragraphs A and B. However, consistent with the ALJ's other findings, the undersigned finds substantial evidence in the record as a whole to support the finding of "moderate" limitations in this domain.

For example, in addition to citing to the psychological reports of Drs. Madrigal, Malloy and Goldsmith, and portions of the reports of Dr. Cook, Dr. Sed, and Dr. Froilan, (*see* Tr. 23), the ALJ considered Plaintiff's activities of daily living, including his ability to perform basic self-care.

> The claimant's daily activities have been considered with regard to the assessment of his capabilities. … In his December 23, 2017 consultative psychological examination, the claimant admitted doing household chores including sweeping, picking up toys, grocery shopping, and taking out trash, and performed his own personal hygiene independently. (Ex. 3F, p. 2). In November 2018, the claimant reported to his … new physical medicine specialist, Dr. Jerry Mysw, MD, that he was limited a little physically in leisure and daily living activities, but not limited in self-care or in walking. (Ex. 33F, p. 27).

(Tr. 21). There is also no evidence that Plaintiff had poor hygiene or otherwise lacked the ability to care for himself. (*See* Tr. 1326, 1343).

In support of reversal, Plaintiff chiefly cites to the same BWC forms competed by Dr. Ford. But Dr. Ford's records are even less persuasive to support marked or extreme limitations in the "adapting and managing oneself" domain than with respect to the interacting with others domain.

One reason for that is that the BWC form categories do not precisely correspond to the four functional paragraph B domains. In particular, two separate categories on the BWC forms – "Activities of daily living" ("ADLs") and "Adaption" - appear relevant to the single paragraph B domain of adapting or managing oneself. While Dr. Ford consistently

rated Plaintiff as having "marked" impairment in "Adaptation," he was less consistent in assessing Plaintiff's level of restriction in the BWC category of ADLs.  In the ADLs category, he often assessed only "moderate" restriction.  (*See*, *e.g.*, Tr. 2518, 2520, 2522, 2524, 2526, 2529, 2530, 2532).  Thus, when both of the relevant BWC categories are considered, Dr. Ford's records do not wholly support either an "extreme" or a "marked" restriction in the domain of adapting and managing oneself.  In addition, the ALJ appropriately discounted the BWC forms as inconsistent with other substantial evidence, and as inadequately supported because the records contain only summaries of subjective complaints and of Dr. Ford's estimation of Plaintiff's progress, as opposed to more detailed clinical examination records.  (Tr. 22).

In addition to Dr. Ford's records, Plaintiff relies upon his own testimony and that of his girlfriend.  But although Plaintiff testified at the hearing that he got frustrated if something was not done right the first time, he testified that he reacted in a similar way before the accident.  (Tr. 48).  And while Plaintiff's girlfriend testified he was worse after his accident and would be "set off" by little things, (Tr. 50), her testimony did not require the ALJ to find even "marked" limitations in this functional area.  In sum, the existence of some evidence to support a contrary finding does not require the Court to ignore other substantial evidence that supports the ALJ's finding of only "moderate" limitations.

### 3.  Paragraph C Criteria for Listing 12.02

In the absence of proving that he satisfies both paragraphs A and B of the Listing, a plaintiff alternatively may meet Listing 12.02 by proving that his condition satisfies both paragraphs A and C.  The ALJ set forth the elements of paragraph C before concluding that Plaintiff had failed to meet his burden of proof:

The paragraph C criteria apply to claimants who have a "serious and persistent" mental disorder. To establish such there must be a medically documented history over a period of at least two years of ongoing reliance upon mental healthcare treatment with only marginal adjustment. Such evidence must demonstrate both 1) the claimant's reliance upon medical treatment, mental health therapy, psychosocial supports or highly structured setting that is ongoing and that diminishes symptoms and signs of the claimant's mental disorder; and 2) marginal adjustment. That is, evidence that the claimant would have minimal capacity to adapt to changes in his or her environment or to demands that are not already part of the claimant's daily life. In light of the discussion in the preceding paragraphs, there is insufficient evidence that the claimant meets the C criteria.

(Tr. 23).

Plaintiff criticizes the ALJ's broad reference to his "discussion in the preceding paragraphs," but the undersigned finds no reversible error.  Contrary to Plaintiff's belief, the ALJ's entire discussion of Plaintiff's functional abilities related to and supported the absence of paragraph C criteria.  In addition, as noted by both the Defendant and the ALJ, the paragraph C criteria require proof of "at least 2 years" of reliance upon mental healthcare treatment.  Plaintiff presents little to no argument that he meets the paragraph C criteria.  However, to the extent that he is relying upon his treatment with Dr. Ford, the record reflects that treatment was of less than 2 years' duration.  Given Plaintiff's failure to show how he otherwise meets the C criteria, the undersigned finds no reversible error in the ALJ's finding that he did not. *See Forrest v. Com'r of Soc. Sec.*, 591 Fed. Appx. 359, 366 (6th Cir. Nov. 17, 2014) (holding that even if the ALJ's Step 3 findings were not adequately articulated, any error was harmless in a case where the plaintiff failed to demonstrate that he met or medically equaled the listed impairment).

15

**C. The ALJ's Analysis of Medical Opinion Evidence[5]**

Plaintiff's second claim of error attacks the ALJ's analysis of the medical opinion evidence.

### 1. Opinion Evidence Relevant to Plaintiff's Mental RFC

For the most part, Plaintiff argues that the ALJ should have found the psychological opinions of Dr. Ford and Dr. Cook to be persuasive, and should have rejected the differing opinions of agency reviewing psychologists, Drs. Malloy and Goldsmith. Plaintiff complains that the ALJ should have rejected the agency psychologists' opinions for the same reasons that he discounted the opinions of agency physicians that he could perform "medium" exertional work. (*See*, *e.g*., Tr. 24, rejecting the agency physical RFC opinions as inconsistent with the latest medical evidence and Plaintiff's testimony and comportment at the hearing).

However, unlike the opinions of the consulting medical doctors, the opinions of Drs. Malloy and Goldsmith were based upon and consistent with the similar opinions and findings of multiple additional examining psychologists. In fact, they were also consistent with portions of Dr. Ford's records to the extent that even Dr. Ford opined on numerous occasions that Plaintiff had only "moderate" restrictions in three of the BWC categories. The "moderate" limitations assessed by Drs. Malloy and Goldsmith also were consistent with portions of Dr. Cook's report, insofar as she found that Plaintiff's "overall intelligence, memory scores for verbal and visual information and memory for other types of input are all within the low average range." (Tr. 23).

---

[5]The ALJ considered the medical opinion evidence under the new regulations applicable to claims filed after March 27, 2017. See 82 Fed. Reg. 6844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15.132 (March 27, 2017).

The ALJ's rejection of some of Dr. Ford's BWC form opinions and of some of Dr. Cook's opinions is substantially supported. Like many others, Dr. Cook was a one-time examiner.  In her evaluation report, "Dr. Cook opined that general intellectual abilities and basic academic skills preclude non-manual labor, that he could not return to manual labor and was thus permanently disabled."  (Tr. 24).  However, the opinion of disability is reserved to the Commissioner, and the ALJ was not required to offer any greater explanation of why he was not accepting the opinion that Plaintiff was disabled.  (Tr. 23-24); 20 C.F.R. § 404.1527(d).  As for Dr. Cook's opinion that Plaintiff's "low average" intellect and basic academic skills preclude all non-manual labor, the ALJ offered an additional reason why he did not believe that Dr. Cook's opinion was fully supported.

> [H]e told Dr. Cook that he failed the ninth grade and completed vocational school. (38F, pp. 2 and 3). Yet in all of his other psychological examinations, the claimant stated that he graduated from high school comfortably without special educations services and then attended NASCAR Institute of Technology in North Carolina for two years and obtained an associate's degree in automotive industry. (Ex. 3F, 4F and 6F). This inconsistency by itself does not refute all of the neuropsychological findings, but it does cast some doubt on the genuineness of the claimant's presentation there.

(Tr. 24-25).  The ALJ was also entitled to consider that Dr. Cook's opinion was inconsistent with the assessments of other examiners, including Dr. Madrigal's opinion that he did not have a neurocognitive impairment, Dr. Sed's conclusion that Plaintiff could still perform simple tasks, and Dr. Froilan's assessment that Plaintiff's performance on general cognitive tasks suggested average intelligence.  (Tr. 23).

While Dr. Ford was a treating psychologist, the ALJ appropriately pointed out that his checkbox opinions were not supported by any detailed clinical records or objective findings such as mental status exams.  *See Jones v. Com'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("If the treating physician's opinion is not supported by objective

17

medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for [his] rejection."). Dr. Ford's opinions also are contradicted by other substantial evidence of record including objective testing and clinical evaluative exams by other psychologists. As discussed, his opinions contain variations that at times suggest no more than moderate limitations, consistent with the RFC as determined. And another BWC form authored by treating psychologist Dr. Shuman also found only "moderate" restrictions in all areas. (Tr. 24).

### 2. Opinion Evidence Relevant to Physical RFC

Turning briefly to the evidence concerning his physical RFC limitations, Plaintiff argues that the ALJ should not have rejected the "opinion" of treating NP Adkins, because that provider's opinions were "consistent with" other evidence demonstrating decreased physical strength and ongoing fatigue. However, Plaintiff does not explain precisely which opinion he is talking about, or how any of NP Adkins' opinions would have required greater physical RFC limitations than the restricted range of sedentary work as determined. Notably, the main "opinion" offered by NP Adkins is a statement on BWC forms and in summary notes that Plaintiff's "recommended work status is No Work Capacity." NP Adkins left blank areas on the BWC forms that would have indicated more specific RFC opinions concerning how long Plaintiff can sit, stand, and walk, any lifting restrictions, or what postural restrictions he had. Any opinion on whether a plaintiff has the ability to work is not considered a medical opinion but instead is reserved to the Commissioner. (Tr. 23).

Apart from pointing out this threshold principle, the ALJ described the examination reports and workers' compensation form opinions provided by NP Adkins as having "little

support in or consistency with the record as a whole." (Tr. 24). For example, the ALJ explained that NP Adkins' failed to provide objective testing results such as "specific muscle testing results," as well as consistent notes that Plaintiff was able to move all extremities without difficulty, that he was able to follow commands without difficulty, and that his grips were equal bilaterally. (Tr. 21). The ALJ further noted other normal musculoskeletal examinations, including unremarkable findings during an August 2019 independent medical examination. (*Id.*) The ALJ pointed to Plaintiff's subjective reports to a pain doctor that he had no pain, and findings by another physical medicine/rehabilitation specialist of normal bulk and tone, normal sensory examination, no ataxia with sitting, standing or walking, a normal gait, and an ability to easily rise from a chair without use of his arms. (*Id.*) And the ALJ considered Plaintiff's daily activities. (*Id.*)

NP Adkins provides little to no explanation for his "no work" opinions. In one of the few explanations to be found, dated September 14, 2018, NP Adkins states that the "no work" status is based upon Plaintiff's "inability to perform any type of physical labor," and a perception that he would be unable to perform work "that would involve making decisions or that would involve him to lift heavy objects" or that "would ask for a constant continuous movement or picking up anything that would be heavy." (Tr. 2329). Arguably, the sedentary RFC with the mental RFC as determined accounts for such limitations. In addition, virtually all of NP Adkins' BWC-related records include statements to suggest that the "no work" status is "temporary." (Tr. 24, citing records; *see also*, *generally* Tr. 2146, 2159-2160, 2260, 2264, 2269, 2273-2276, 2278-82, 2329. 2334, 2469). Indeed, NP Adkins consistently notes that Plaintiff is progressing "better than expected" and lists

future dates on the forms on which he predicts Plaintiff "should be able to return to the job held on the date of injury." (*See*, *e.g.*, Tr. 2471-72, Tr. 2473-74, Tr. 2475-76, Tr. 2478-79, Tr.2479-80, Tr. 2485, Tr. 2493-94).  Accordingly, the undersigned finds the ALJ's rejection of NP Adkins' opinions to be substantially supported.

### IV.  Conclusion and Recommendation

For the reasons explained herein, the undersigned concludes that the ALJ did not err at Step 3 and also committed no reversible error in determining Plaintiff's RFC based upon the record presented, including but not limited to the evaluation of all medical opinion evidence.  Therefore, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BRYAN HARRIS,                                           Case No. 1:20-cv-844

       Plaintiff,                                         Dlott, J.
                                                        Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

       Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).